IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| Oba Hassan Wat Bey, Edward Ebanks, Herbert L. Hinnant, Michael Nichols, Pedro Rivera Bey Sr., Hassan Abdullah Plaintiffs | § § § § § | |
| v. | § § | Civil Action No. 99 Civ. 3873 (LMM)(RLE) |
| THE CITY OF NEW YORK, Michael Caruso, Individually and as Inspector Gen. the City of New York DOI, Bernard B. Kerik, individually and as Commissioner of the Department of Corrections of the City of New York, Defendants. | § § § § § § § § | |

## PROPOSED AMENDED COMPLAINT

Plaintiffs, Oba Hassan Wat Bey (p/k/a Robert Watson) and Pedro Rivera Bey Sr., by and through their attorney, Irene Donna Thomas, Esq., complains of defendants as follows:

1. This is a civil action seeking damages, declaratory and injunctive relief against defendants for committing acts under color of law which deprive plaintiffs of rights secured to them under the Constitution and laws of the United States of America, including the intent to deprive plaintiffs of rights to freedom of speech, right to freedom of association, free exercise of religion, rights to equal protection of the law and rights to due process of law and other rights and liberties, and for refusing or neglecting to prevent that deprivation and denial, as will be more fully specified below.

## JURISDICTION

2. This court has jurisdiction of this action pursuant to Section 1343 of Title 28, 42 U.S.C. §1981 and 42 U.S.C. §1983. This Court has pendent jurisdiction over plaintiff's state law causes of action.

3. Venue is proper in this District pursuant to Title 28, U.S.C., sec. 1391 because all or a substantial part of the events or omissions giving rise to the claims occurred in this district.

## THE PARTIES

1

4. Plaintiff Oba Hassan Wat Bey (p/k/a Robert Watson)(hereafter referred to as "Wat Bey") is a former employee of the New York City Department of Corrections. Wat Bey was hired by defendant City of New York as a Corrections Officer on or about July 6, 1989. On or about May 23, 1997, Wat Bey was promoted to the rank of Captain. He held that title until his discharge on or about December 18, 1998.

5. Plaintiff Wat Bey was and at all times relevant to this matter was a tenured, permanent, competitive class civil service employee with a property interest in his employment.

6. During his employment tenure, Wat Bey's job performance has been at least satisfactory.

7. Plaintiff Pedro Rivera Bey Sr. (hereafter referred to as "Rivera") is a former employee of the New York City Department of Corrections. Rivera was hired by defendant City of New York as a Corrections Officer on or about May 20, 1985. Rivera held that title until his discharge on or about December 18, 1998.

8. Plaintiff Rivera was, and at all times relevant to this matter, was a tenured, permanent, competitive class civil service employee with a property interest in his employment.

9. During his employment tenure, Rivera's job performance has been at least satisfactory.

10. Defendant City of New York is a municipal corporation of the State of New York.

11. Defendant City of New York is, and at all times relevant hereto, was an "employer" within the meaning of the New York City and New York State Human Rights Laws.

12. Defendant City of New York is, and at all times relevant hereto, was a "person" within the meaning of 42 U.S.C. §1983.

13. Defendant Michael Caruso was, at all times relevant hereto, an Inspector General of the New York City Department of Investigations ("DOI") with responsibility for the New York City Department of Corrections and was a "person" within the meaning of 42 U.S.C. §1983.

14. Defendant Bernard B. Kerik is, and at all times relevant to this matter, is a "person" within the meaning of 42 U.S.C. §1983 and Commissioner of the New York City Department of Corrections ("DOC").

15. Plaintiff sues the defendants who are natural persons in both their individual and official capacities.

16. In doing the acts alleged in this complaint, defendants acted as agents for and on behalf of all other defendants named in this complaint.

000141

17. At all times material to this action, the defendants have acted under color or custom or usage of the laws of the State of New York, and continue to act.

## FACTUAL ALLEGATIONS

18. During all times relevant herein, defendant Michael Caruso was responsible for investigating charges of misconduct by DOC employees.

19. Rule 3.20.03 of the Departmental Rules and Regulations provide that DOC employees who make false official statements and who are convicted in a court of criminal jurisdiction have engaged in conduct of comparable seriousness.

20. Rule 3.20.03 applies to all DOC employees.

21. The rule prohibiting submission of false tax documents to the DOC applies to all DOC employees.

22. All DOC employees are subject to the same standards of conduct and evaluation.

23. For discipline purposes, it is irrelevant if DOC employees who submitted false tax documents to the Department filed all tax returns and paid all taxes.

24. All DOC employees were investigated under the same "99 exemptions" tax investigation.

25. Caruso is responsible for maintaining standards of conduct for all DOC employees.

26. On or about mid-1996, plaintiffs Wat Bey and Rivera adopted the Moorish American faith. One of the ways plaintiffs chose to manifest their religious observance is through the name they used to present themselves before the public and God. Plaintiffs adopted the last name of "Bey." Plaintiff Wat Bey changed his entire name from Robert Watson to "Wat Bey".

27. Plaintiffs notified defendants that they had adopted the Moorish American faith and informed defendants, in good faith, of the rights they believed they possessed as Moorish Americans.

28. Plaintiffs submitted some or all of the following forms to the DOC: (1) Constructive Notice; (2) Constructive Notice of Concurrence; (3) Laws Pertaining to Form W-4; (4) Employer Options; (5) "Rights, Pursuant to Zodiac Constitutional Law, Without Prejudice ARR".

29. On or about 1996, plaintiffs submitted tax forms to the DOC claiming tax exempt status or "99".

3

30. Plaintiff's submission of these documents to the DOC did not generate disruption in the workplace.

31. Plaintiff's submission of these documents did not impede the general operation of the DOC.

32. Plaintiff's submission of these documents did not adversely affect the working relationships between plaintiffs and their superiors necessary to the proper functioning of the DOC.

33. DOC employees who did not claim to be Moors submitted the same or substantially similar documents to those submitted by plaintiff.

34. On or about April 10, 1996, the New York City Department of Investigation, under the direction of defendant Michael Caruso, began an investigation called "99 exemptions" to investigate all employees of the New York City Department of Correction who had claimed between 40 or more exemptions on their federal and state tax forms submitted to the DOC.

35. Defendant Caruso determined that these documents constituted "false tax documents."

36. On or about June 18, 1996, Caruso received a printout from the Office of Personnel Administration for the DOC listing all DOC employees who had filed 40 or more exemptions. Eliminating all duplicates, this list contained the names of 780 DOC employees who had filed 40 or more exemptions. During the investigation, Caruso learned that an additional 748 employees had submitted false tax documents with the Department.

37. Caruso submitted this list to the Manhattan District Attorney's Office and the New York State Attorney General's (A.G.'s) office.

38. The Manhattan District Attorney's Office and the New York State Attorney Generals office told Caruso which DOC employees should be arrested.

39. During the investigation, DOI officials nor DOC officials advised plaintiffs that they were under investigation.

40. Plaintiffs were not arrested.

41. Defendant Caruso learned that defendant Kerik's lover, Jeanette Pinero and Kerik's "right hand man", John Picciano submitted false tax documents to the DOC.

42. On or about July 12, 1996, defendant Caruso received and read a memorandum from the New York City Police Department (NYPD) claiming, among other things, that an individual involved in a "car stop" was a member of a group known as "The Great Seal Association of Moorish Affairs" and that members of that group had been previously arrested and were

4

suspected of armed robberies and trafficking in high-powered automatic weapons.

43. Plaintiff was not identified in the NYPD memorandum as having engaged in the conduct addressed.

44. Plaintiff was never accused of being suspected of "armed robberies" and "trafficking in high-powered automatic weapons".

45. The NYPD memorandum did not identify the individual involved in the "car stop" as a DOC Corrections Officer.

46. Plaintiff's only connection to the NYPD memorandum was his status as a members of the "Moorish Nation" and his association with the Great Seal of Moorish American Affairs.

47. During the "99 exemptions" investigation, defendant Caruso and/or employees under his supervision, compiled lists of DOC employees who he/they identified as Moorish Americans.

48. During the tax investigation, approximately 29 DOC employees were wiretapped. One of those wiretapped was the plaintiff.

49. During the tax investigation, informants were used in undercover surveillance operations to attend meetings of the Moorish faith to obtain information.

50. The DOI's investigation lasted 18 months.

51. After the conclusion of the 18 month investigation, defendant Caruso made recommendations to the DOC for the initiation of disciplinary charges against certain DOC employees who filed false tax documents.

52. Of those employees who were not arrested and criminally charged, on or about December 3, 1997, Caruso recommended that only 21 DOC employees, including plaintiffs, identified by DOI as Moorish American, be summarily suspended. Each person was merely informed that they were being summarily suspended because they supplied the DOC with tax forms which contained false information.

53. Caruso targeted Moorish Americans, including plaintiffs, for adverse treatment because they were a "security concern" because (1) they were affiliated with the "Moorish National" group, and (2) because of documents they submitted to the DOC announcing their religious philosophy.

53(a). On or about December 3, 1997, plaintiffs were summarily suspended, without pay, allegedly for submission of false tax documents. Before ordering plaintiff's summary suspension, defendant Caruso did not interview plaintiff nor in any other manner give plaintiffs

5

notice that the NYPD memorandum was the basis for their adverse treatment nor were plaintiffs given an opportunity to be heard on this reason for the summary suspension.

54. On or about early December 1997, then Mayor Rudolph Giuliani referred to plaintiff's religious beliefs as a "scheme" and referred to the "Moorish National" group as a "cult." Giuliani also announced, prior to the holding of administrative hearings, that all employees charged with failing to file state and city income tax returns and who had been suspended "would almost certainly lose their jobs after disciplinary proceedings against them were completed."

55. On or about December 8, 1997, Edward Kuriansky, Commissioner of the New York City Department of Investigation, publically announced that plaintiff's Moorish American religious philosophy "is extremely offensive and serious conduct" and further stated that "for a sworn law enforcement officer, who carries a gun, who have taken an oath to the United States and the state constitution, and for all other purposes claims the benefits of citizenship, who has the gall not to pay his fair share – I mean it's really outrageous."

56. Kuriansky made these statements with full knowledge that other DOC employees, law enforcement officers, who did not claim to be Moors, submitted false tax documents to the Department claiming either "99" exemptions or to be tax exempt and who also submitted documents to the Department claiming that they were not subject to the jurisdiction of the United States and/or the State of New York.

56(a). On or about January 1998, plaintiffs were placed on modified duty assignment under horrific and filthy working conditions, isolated from inmates and co-workers. While on modified duty assignment, plaintiffs were not permitted to possess, carry or purchase a personal firearm, be assigned to any duties requiring the possession, handling, maintenance or security of departmental firearms, chemical agents or funds, and they had no responsibility and supervision of care, custody and control of incarcerated inmates, among other things. Before being placed on modified duty, Caruso, nor any other official from the DOI informed plaintiffs that they had been targeted for modified duty because they were deemed to raise "security concerns" because of their affiliation with the Moorish National group.

57. In early February 1998, the World Service Authority contacted Michael Caruso and advised Caruso that use of the name "Bey" was an effort to assert the right to change nationality and to manifest religious observance, and that this right was being violated by the New York City Department of Corrections.

58. On or about March 1998, defendant Caruso issued a Memorandum of Complaint, to the DOC recommending that plaintiffs be terminated because they submitted false tax instruments to the DOC and engaged in conduct unbecoming an officer or member of the Department.

6

59. Before issuing the memorandum of complaint, defendant Caruso did not interview plaintiffs nor in any other manner given notice that the NYPD memorandum was the basis for his adverse treatment nor were plaintiffs given an opportunity to be heard on this reason for their proposed termination.

60. On or about March 5, 1998, the DOC Trials Division drafted and served plaintiffs Charges and Specifications charging plaintiffs with submitting false instruments concerning taxes to the Department and with violating their oath of office.

61. Defendant Caruso did not summarily suspend DOC employees who did not claim to be Moors but who also submitted false tax documents to the Department.

62. On or about July 27, 28, 30 and August 10, 1998, a hearing was held before Administrative Law Judge Rosemarie Maldonado at the Office of Administrative Trials and Hearings (OATH) concerning the March 5, 1998 charges and specifications filed against the plaintiffs.

63. During the OATH proceedings, without warning, defendants activated "Code Blue" procedures against plaintiffs. "Code Blue" is a procedure normally used in jails when there is an alarm indicating a problem with inmates.

63(a). On or about November 5, 1998, plaintiff Rivera informed plaintiff Wat Bey (a Captain) that he observed a discriminatory gesture written on the male locker room wall near the urinal stall & sink "99 Club Muslim".

63(b). On or about November 11, 1998 plaintiff Wat Bey informed Warden Robertson (thru channels) of the writing on the male locker room wall. Wat Bey also questioned whether this was an act by someone given orders by someone higher up in the Department of Corrections in order to provoke problems based on race and religion which would result in the Islamic Moorish Americans being terminated from the Department of Corrections. Warden Robertson never responded to this complaint of discrimination.

64. On or about November 30, 1998, the ALJ issued a Report and Recommendation in connection with the charges and specifications.

65. The ALJ made a factual finding that Moors believe that they are entitled to the same tax exemption granted Native Americans.

66. The ALJ also made a factual finding that "pursuant to their beliefs, all 17 respondents [including plaintiffs] filed federal W-4 forms and 15 filed state forms claiming exemption from income tax withholdings."

67. On December 18, 1998, Kerik adopted the ALJ's report and recommendation despite

7

000146

evidence contained in the report that plaintiffs had raised a "selective prosecution" defense that the ALJ was not authorized to consider. That day, he imposed the sanction of discharge for about 21 Moorish Americans for submitting false tax documents to the DOC.

68. Defendant Kerik was not required to adopt the ALJ's recommendation for plaintiffs' discharge and had considerable authority and discretion to impose a different sanction.

69. For many years prior to plaintiffs' summary suspension, modified duty placement and ultimate discharge, defendants tolerated the practice of employees claiming excessive exemptions or claiming tax exempt status without objection and without advising employees that their conduct could lead to disciplinary action.

70. DOC employees who submitted false tax documents to the Department but who did not claim to be Moorish Americans were not subject to the same adverse treatment as the Moorish Americans.

71. White DOC employees who submitted false tax documents to the Department were not subject to the same adverse treatment as the Moorish Americans.

72. On May 27, 1999, Oba Hassan Wat Bey (Robert Watson) and five other discharged Moorish American employees filed a civil action in the Southern District of New York, 99 Civ. 3873, protesting their discharge as unconstitutional.

73. On February 4, 2000, the DOC Legal Division contacted its investigation and trials unit to determine whether similar charges of misconduct, i.e., filing false tax documents, had been brought against DOC employees who did not claim to be Moors.

74. On March 16, 2000, Josephine Pradegan, Caruso's immediate subordinate, gave the Legal Division a list of 10 DOC employees who did not claim to be Moors against whom similar charges of filing false tax documents had been filed.

75. Virtually all employees on that list had been selected for arrest by state or federal authorities and were not in the same category with plaintiffs.

76. Beginning on or about January 30, 2001, defendant Caruso submitted a memorandum and complaint to the DOC for about 117 DOC employees who submitted the same or substantially similar documents to the DOC as those submitted by Moorish Americans.

77. Defendant Caruso recommended that disciplinary action against most of these individuals be deferred.

78. These employees, the DOC employees who submitted false tax documents to the DOC, but who did not claim to be Moors, were never disciplined.

8

79. In mid-December 2003, plaintiffs learned for the first time that Caruso selected them for summary suspension, modified duty placement and recommended their discharge because Caruso determined that they were a potential security concern due to Caruso's receipt of the NYPD memorandum and plaintiff's affiliation with the "Moorish National" group. Defendants concealed the true nature of the charges against plaintiff.

80. Between 1996 and December 18, 1998, (the date of plaintiffs discharge), Caruso did not order the summary suspension and modified duty assignment for any white DOC employees who submitted the same or substantially similar documents as those submitted by the Moorish Americans, including, but not limited to: John Sheridan, Carlo Pannizzo, John Russo, D. Ryan, D. Sabatano, James Salvio, George Sheehy, Nicholas Varounis, Jr., P. Venechanos, Jospeh Vicenzo, Richard Weiss.

81. During the tax investigation, Caruo kept various lists of identified Moors who were DOC employees.

82. Defendant Caruso did not recommend summary suspension, modified duty or discharge for defendant Kerik's lover, Jeannette Pinero, or his "right hand man", John Picciano despite his knowledge that they submitted false tax documents to the Department.

83. Defendants claim that they were justified in summarily suspending, ordering modified duty and terminating plaintiff's employment, and the employment of all other Moorish Americans, only because they are a security concern due to their affiliation with the Moorish National group.

84. Defendants did not identify and target for adverse employment treatment members of other religious groups for engaging in the same or substantially similar conduct as plaintiffs.

85. By implementing a systematic policy, practice or custom aimed at targeting Moorish Americans for adverse employment action because of their speech on a matter of public concern, their association or affiliation with the "Moorish National group" and/or the Great Seal of Moorish American Affairs, by selectively enforcing DOC rules and regulations against employees identified as Moorish Americans because of their race, religion, an intent to inhibit or prevent the exercise of constitutional rights and a malicious or bad faith intent to injure plaintiffs, by denying plaintiffs adequate notice and an opportunity to be heard on the allegations that they are a "security concern" due to their affiliation with the "Moorish National group" and because they submitted religious affiliation documents to the DOC, and in doing other acts not yet known, Caruso violated plaintiffs' constitutional rights to freedom of speech, freedom of association, free exercise of religion, equal protection of law and due process of law.

86. By failing to remedy Caruso's constitutional wrongs against plaintiffs, by allowing defendant Caruso's systematic policy, practice or custom aimed at targeting Moorish Americans for adverse employment actions to continue, by failing or refusing to order the DOC's

9

Investigation and Trials Unit to conduct an independent investigation of the basis of the charges and specifications against plaintiffs and by being negligent in managing Caruso and DOC subordinates who caused the unconstitutional deprivations visited upon plaintiffs, defendant Kerik violated plaintiffs' constitutional rights to constitutional rights to freedom of speech, freedom of association, free exercise of religion, equal protection of law and due process of law.

87. By promulgating, executing and/or implementing a policy statement, ordinance, or regulation or by adopting and ratifying a decision promulgated by DOI policy-making officials to target all DOC employees of the Moorish American faith for adverse employment actions in violation of their constitutional rights to freedom of speech, freedom of association, free exercise of religion, equal protection of the law and due process of law, where DOI officials regularly attended and participated in "leadership" meetings with then-Mayor of the City of New York, Rudolph Giuliani to keep the Mayor informed of all major investigations and where Mayor Rudolph Giuliani approved of the investigation leading to plaintiffs' discharge, and where Giuliani made announcements in the media approving of the investigation and the discharge of Moorish Americans–although DOC employees who did not claim to be Moors engaged in the same or substantially similar misconduct, defendant City of New York violated plaintiffs' constitutional rights.

88. As a legal and proximate result of defendant Caruso's, defendant Kerik's and defendant City of New York's violation of §1983, plaintiffs have suffered and continues to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation, overtime, night differential and other fringe benefits; plaintiff has suffered and continues to suffer impairment and damage to his good name and reputation; plaintiffs have suffered and continues to suffer severe and lasting embarrassment, humiliation and anguish, and other incidental and consequential damages and expenses.

89. The conduct of defendants were outrageous and malicious, was intended to, and in fact, injured plaintiff and was done with reckless indifference to plaintiff's protected civil rights, entitling him to an award of punitive damages against the individual defendants.

## COUNT I
(Freedom of Association)

90. Plaintiffs repeat and reallege paragraphs 1-89 above with the same force and effect as if set forth herein.

91. By summarily suspending plaintiffs, ordering their modified duty placement and recommending them for termination (and in fact discharging them) and treating them as a "security concern" for no reason other than the fact that he is affiliated with the "Moorish National group" identified in an NYPD memorandum and because he submitted documents to the DOC announcing his religious philosophy, the defendants engaged in a policy, custom and/or practice to violate the plaintiff's First Amendment right to freedom of association.

000149

## COUNT II
(Freedom of Speech)

92. Plaintiffs repeat and reallege paragraphs 1-91 above with the same force and effect as if set forth herein.

93. By basing their decision to summarily suspend, place on modified duty and terminate plaintiffs on the content of their speech, documents submitted to the DOC, on a matter of public concern, professing adoption of the Moorish American faith and his rights and immunity(ies) as a member of that religious faith, pursuant to the DOC's policy prohibiting discrimination on the basis of religion, defendants engaged in a policy, custom and/or practice to violate plaintiff's constitutional right to freedom of speech.

## COUNT III
(Free Exercise of Religion)

94. Plaintiff repeat and reallege paragraphs 1-93 above with the same force and effect as if set forth herein.

95. By basing a decision to summarily suspend, place on modified duty and discharge plaintiff based on the content of his religious speech and beliefs, defendants engaged in a policy, custom and/or practice to violate their right to the free exercise of religion.

## COUNT IV

(Equal Protection of Law - Selective Enforcement and Selective Prosecution)

96. Plaintiffs repeat and reallege paragraphs 1- 95 above with the same force and effect as if set forth herein.

97. By selectively subjecting plaintiffs, Moorish Americans, and other Moorish Americans, for adverse employment actions compared with others similarly situated, where the selective treatment was based on race, religion, the intent to inhibit the exercise of their constitutional rights and a malicious or bad faith intent to injure them, defendants engaged in a policy, custom and/or practice to violate plaintiffs' right to equal protection of the law.

## COUNT V
(Due Process of Law)

98. Plaintiffs repeat and reallege paragraphs 1- 97 above with the same force and effect as if set forth herein.

99. By intentionally and willfully concealing the true nature of the charges against plaintiffs, defendants engaged in a policy, custom and/or practice to deprive them of due process

000150

of law, i.e., the right to adequate notice and an opportunity to be heard on the actual charges against them before deprivation of a property interest in their employment, in violation of the 14th Amendment to the United States Constitution.

## COUNT VI
### (Employment Discrimination - New York State Human Rights Law)

100. Plaintiffs repeat and reallege paragraphs 1 - 99 above with the same force and effect as if set forth herein.

101. Plaintiffs are Hispanic males.

102. By engaging in a pattern and practice of targeting Moorish Americans for adverse treatment due solely to their association with the Moorish American faith, defendants violated their right to be free from race and religious discrimination.

103. DOC employees who did not claim to be Moorish American, some of whom were white, but who also submitted the same or substantially similar documents to the Department were not similarly suspended, placed on modified duty, recommended for, and in fact discharged.

104. Plaintiff's race and religion was at least a motivating factor in his discharge.

105. Defendants conduct has caused plaintiff to suffer damages as more fully stated above.

## COUNT VII
### (Employment Discrimination – New York City Human Rights Law)

106. Plaintiffs repeat and reallege paragraphs 1 - 105 above with the same force and effect as if set forth herein.

107. Plaintiffs are Hispanic males.

108. By engaging in a pattern and practice of targeting Moorish Americans for adverse treatment due solely to their association with the Moorish American faith, defendants violated their right to be free from race and religious discrimination.

109. DOC employees who did not claim to be Moorish American, some of whom were white, but who also submitted the same or substantially similar documents to the Department were not similarly suspended, placed on modified duty, recommended for, and in fact discharged.

110. Plaintiff's race and religion were at least a motivating factor in their discharge.

000151

111. Defendants conduct has caused plaintiff to suffer damages as more fully stated above.

## COUNT VIII
### (42 U.S.C. §1981)

112. Plaintiffs repeat and reallege paragraphs 1 - 111 above with the same force and effect as if set forth herein.

113. Plaintiffs are Hispanic males.

114. By engaging in a pattern and practice of targeting Moorish Americans for adverse treatment due solely to their association with the Moorish American faith, defendants violated their right to be free from race and religious discrimination.

115. DOC employees who did not claim to be Moorish American, some of whom were white, but who also submitted the same or substantially similar documents to the Department were not similarly suspended, placed on modified duty, recommended for, and in fact discharged.

116. Plaintiff's race and religion was at least a motivating factor in his discharge.

117. Defendants conduct has caused plaintiff to suffer damages as more fully stated above.

118. A jury trial is demanded.

**WHEREFORE, plaintiffs pray that this Court grant judgment to him containing the following relief:**

a. An award of plaintiff's actual damages in an amount to be determined at trial but not less than Fifteen Million Dollars ($15,000,000) for damages, including but not limited to: loss of wages, overtime, benefits and promotional opportunities, including an award of front pay compensating plaintiff for loss of future salary and benefits, out of pocket expenses

b. Reinstatement to employment with the New York City Department of Corrections, including expungement of adverse comments in plaintiffs' personnel file, restoration of seniority

c. An award of damages in an amount to be determined at trial but not less than Fifteen Million Dollars to compensate plaintiffs for mental anguish, humiliation, embarrassment, and emotional injury;

000152

  d. An award of punitive damages against the individual defendants to be determined at trial but not less than Fifteen Million Dollars;

   e. An award of reasonable attorney's fees and the costs of this action;
   f. Such other and further relief as this Court may deem just and proper.

Dated: Brooklyn, New York
   March 14, 2007

                _____
                Irene Donna Thomas (IT8759)
                THOMAS & ASSOCIATES
                977 St. John's Place
                Brooklyn, New York 11213
                (718) 493-9287

C:\Documents and Settings\Irene\My Documents\My Files New\oba\amendcomplaint2007\complaintamend.wpd

000153